Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 716 | **DATE** | November 18, 2002 |
| **CASE TITLE** | *United States v. Nirali Patel* | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
　　　☐ FRCP4(m)　☐ General Rule 21　☐ FRCP41(a)(1)　☐ FRCP41(a)(2).

(10) ■ [Other docket entry]　For the reasons set forth in the attached Memorandum and Order, the Court DENIES Defendant Patel's Motion to Suppress [66-1]. It is so ordered.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| ✓ | Notices mailed by judge's staff. | | NOV 2 0 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | 71 |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| RTS | courtroom deputy's initials | 02 NOV 20 AM 7:21 FILED | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 01 CR 716 |
| v. | ) | |
| | ) | Hon. Blanche M. Manning |
| NIRALI PATEL | ) | |

DOCKETED
NOV 2 0 2002

## MEMORANDUM AND ORDER

A federal grand jury returned a two count indictment against Defendant Nirali Patel alleging bank robbery by force, violence and intimidation, in violation of 18 U.S.C. §§ 2113(a) and 2 (Count I) and bank fraud, in violation of 18 U.S.C. §§ 1344 and 2 (Count II). Patel subsequently pled guilty to Count II and went to trial on Count I. After the jury was unable to reach a unanimous verdict, this Court declared a mistrial. The retrial is set for November 18, 2002. The present matter comes before this Court on Patel's motion to suppress her alleged confession. For the reasons set forth below, this Court DENIES this motion.

## BACKGROUND[1]

Count One of the Superceding Indictment alleges that on August 11, 2001, Patel participated in the robbery of Fifth Third Bank in Naperville, Illinois using force, violence, and intimidation. The Government alleges that Patel, who was a bank employee at the time, helped plan and execute the robbery, knowing at the time that it would involve violence against a fellow bank employee. Patel allegedly admitted two men into the bank before it opened and agreed to leave the vault open with an unusually large amount of cash in it and supply the men with the surveillance videotape. To make the robbery look "real" Patel agreed that the robbers would

---

[1] The facts in the Background section are taken from the Superceding Indictment, the parties' submissions to the Court, and the trial testimony.

"push them [the bank employees] around." As a result of the scheme, the two robbers threatened another bank employee with death, kicked him in the stomach and leg, and hit him in the head with a gun. In all, the robbers made off with $166,000.

On August 13, 2001, two days after the robbery, Detective Cammiso of the Naperville Police Department contacted Patel by telephone to request that she come into the Naperville police station to discuss the robbery. (Tr. at 173.) At trial, Cammiso admitted on cross-examination that he believed at that time that Patel was a suspect but did not tell her that when he called her to come into the police station. (Id. at 204.) Patel voluntarily drove herself to the police station that same day around 2:00 p.m. (Id. at 174.) After arriving, Cammiso met Patel in the lobby and escorted her to the lowest level of the police station to a small windowless room which had a table and chairs and two doors, neither of which were locked. (Id. at 175.) Waiting in the room was Special Agent Fragomeli from the FBI. (Id.)

The interview lasted three hours, until 5:00 p.m., at which time Patel asked to and was permitted to leave the station. (Id. at 188-89.) During these three hours, Patel allegedly confessed to participating in and planning the robbery. (Id. at 178-88.) Although Patel denied that she confessed, for the purposes of the present motion only, the Court will assume that she did confess. Additionally, Cammiso and Patel have widely divergent recollections as to what transpired during her three hours at the police station. Consequently, the Court will examine the testimony of Cammiso and Patel regarding the three hours Patel spent at the police station on August 13, 2001 and then determine whose testimony this Court finds more credible.

### A. Detective Cammiso's Testimony

Cammiso testified that when the interview began he and Agent Fragomeli told Patel that she was not under arrest and could leave any time "she wished." (Id. at 175.) Shortly thereafter,

Cammiso and Fragomeli told Patel that she was a suspect in the robbery. (Id. at 178.) According to Cammiso, Patel did not deny that she was not involved in the robbery. (Id.) The officers then began to explain their reasons for why they believed she was a suspect. (Id.) They explained that because of her job at the bank she was in a perfect position to set up the robbery. (Id. at 179.) As the officers explained their reasons, Patel did not verbally respond to the officers but allegedly began to nod her head affirmatively as if in agreement with the accusations. (Id.) At one point, Patel stated that she wanted to talk to her father. (Id. at 227-28, 263.) In response, Agent Fragomeli stated that he believed that her father would want her to tell the truth. (Id. at 263.)

After an hour and a half of asking questions and Patel nodding her head, the officers took a fifteen minute break. (Id. 179-80) During the break, Cammiso asked Patel if she wanted to use the restroom or a glass of water. (Id.) Patel refused this offer (id.) and testified that she was left alone in the room during the break. (Id. at 475.)

After the break, Cammiso told Patel that if she wished to cooperate, she needed to "start speaking in her own words." (Id. at 179.) Thereafter, Patel "started answering questions verbally . . . and exchanging some dialog with us." (Id. at 180.) Patel then allegedly admitted that "she was involved in the planning and execution of the robbery." (Id. at 181.) She admitted that she let the robbers into the bank and left the vault doors open so that they could easily access the bank's money. (Id.) She also admitted that she participated in the robbery with Angelo Berdicean, her alleged boyfriend at that time, and that she was to receive $25,000 of the robbery proceeds. (Id. at 184-85.) This verbal colloquy went on for another hour and a half, until 5:00 p.m., when Patel stated for the first time that she "wished to go home." (Id. at 189.) The officers then let Patel leave the station with the understanding that she would return the next morning.

3

(Id.) At no time during the three hours at the police station did either Cammiso or Fragomeli read Patel her Miranda rights. (Id. at 210.)

### B. Patel's Testimony

In addition to denying that she confessed to participating in the robbery, Patel's testimony regarding the events at the police station significantly differed from Cammiso's testimony. Patel testified that the officers never told her she was free to leave and that as soon as she entered the interview room, Agent Fragomeli told her that Angelo Berdicean was at the state's attorney's office giving a statement that Patel planned the robbery. (Id. at 472.) Patel then stated that she wanted to go home to talk with her father. (Id. at 473.) Ignoring her request to leave, Agent Fragomeli stated that she needed to cooperate and that she could help herself by calling Berdicean to get him to implicate himself in the robbery. (Id.) In response, Patel began to cry and stated that she did not "know anything about the bank robbery." (Id.) Patel stated that at that time she wanted to leave but felt like she could not do so because she would "get in trouble." (Id. at 474.) After several more hours of this type of questioning, the officers finally let Patel leave after she made her third request to do so. (Id. at 476.)

### C. Credibility of Patel and Cammiso

Because Patel and Cammiso have completely different versions of her three hours spent at the police station, the Court will assess the credibility of each of their testimonies in determining which series of events this Court will apply in ruling on the instant motion.

After examining Cammiso's testimony, this Court finds several factors of his version of the interrogation troubling. First, Cammiso initially denied that Patel asked to speak to her father, but after he was confronted with his notes of the interview, he admitted that Patel did ask to speak to her father. Second, as Patel contends in her motion, it is somewhat suspect that the

4

police would let Patel leave the station after she admitted to planning and participating in the robbery. Moreover, on cross-examination, Patel's counsel got Cammiso to admit that he did not include in his report many of the circumstances surrounding the interview about which he testified to at trial.

Although this Court has some concerns with the credibility of Cammiso's testimony, it has even greater concerns with the veracity of Patel's testimony. Before the trial, Patel pled guilty to bank fraud (Count II). On cross-examination, Patel admitted that among the customer's she stole from was a 77 year old man who came into the bank for help with his ATM card. (Id. at 484.) While assisting the gentleman, Patel made a duplicate ATM card which she then used to take money out of the elderly man's account. (Id. at 484-85.) In all, Patel used unauthorized ATM cards to steal more than $11,000 from three of the bank's customers. (Id. at 490.) Additionally, Patel stole checks from at least one of the bank's customers. (Id. at 492.) She then passed these checks on to third parties who forged the customer's name and cashed the checks. (Id.) In all, more than $30,000 worth of bad checks were written on these stolen checks. (Id.) Moreover, when the police searched Patel's bedroom, they found that she improperly had "computer records and personal information from Fifth Third Bank customers." (Id. at 493.) Additionally, Patel testified that as early as April of 2001, she attempted to pass bad checks in an attempt to purchase a $4,000 watch. (Id. at 495.) Accordingly, given the above conduct which Patel has admitted to, this Court finds that her testimony lacked credibility.

Therefore, although this Court has concerns over the credibility of Cammiso's testimony, it has much greater concerns over Patel's veracity. As such, this Court finds that the testimony of Cammiso, an 11 year police vetemen, more credible than Patel's testimony and will thus adopt Cammiso's version of the interrogation for the purposes of this motion.

5

## DISCUSSION

Patel contends that this Court should suppress her confession because: (I) at the time she was interrogated, she was in custody and therefore required to be read her Miranda warnings; and (II) the confession was involuntary. The Court will discuss each of these contentions in turn.

### I. Lack of Miranda Warnings

To protect the Fifth Amendment's privilege against self-incrimination, the United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 444 (1966), established a prophylactic rule requiring the government to issue specific warnings to individuals subject to custodial interrogation. See also Moran v. Burbine, 475 U.S. 412, 420 (1986).[2] The Court in Miranda explained that custodial interrogation occurs when the government initiates questioning after a person is in custody or "otherwise significantly deprived of his freedom in any significant way." 384 U.S. at 444.

The "in custody" determination hinges on whether after examining "the totality of the circumstances," the court determines whether the government restrained "the defendant's freedom of movement [to] the degree associated with formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983). The Court in Stansbury v. California, 511 U.S. 318, 323-24 (1994) noted that the "in custody" determination depends upon the objective circumstances of the interrogation not the subjective views of the interrogating officers or the person being questioned. "[T]he only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation." Id. The Stansbury Court, however, held that an officer's

---

[2] The parties do not contest that the officers interrogated Patel, only whether she was in custody. Therefore, for the purposes of this motion, the Court will assume that the police "interrogated" Patel as required under Miranda.

6

knowledge or beliefs if conveyed to the suspect bear on the custody issue in so far as the effect those statements may have on how a reasonable person in the suspect's position would gauge the breadth of his freedom. Id. at 324.

In looking at the totality of the circumstances, the district court must keep in mind that the Miranda warnings are not automatically implicated because: (1) the questioning takes place in the station house; (2) the defendant was the focus of the police investigation; or (3) the police used false statements and/or deception during the interrogation to get the suspect to confess. Oregon v. Mathiason, 429 U.S. 492, 495 (1977); Beheler, 463 U.S. at 1125.

Relying on Mathiason and Beheler, the Seventh Circuit in United States v. Jones, 21 F.3d 165, 170 (7th Cir. 1994), held that a defendant who voluntarily accompanied the police to the station and was questioned for several hours was not "in custody" for Miranda purposes. The Jones court noted that the Supreme Court does not require Miranda warnings because the questioning took place at the police station and that the defendant was the "focus of [the] criminal investigation. Id. Affirming the district court's denial of the defendant's motion to suppress, the court noted that the defendant "was not handcuffed or otherwise physically restrained and was told that he was not under arrest," was told that he "was free to leave," and "[t]here [was] no evidence that the officers made any threatening gestures or statements, or otherwise engaged in strong arm tactics justifying a belief by [the defendant] that he was in custody." Id. See also United States v. Fazio, 914 F.2d 950, 955-56 (7th Cir. 1990) (defendant not "in custody" because he voluntarily agreed to drive himself to the police station, told that he was not under arrest and free to leave any time, and eventually agreed to cooperate).

Here, examining the totality of the circumstance, this Court finds that Patel was not "in

custody" during the three hours she spent at the Naperville police station on August 13, 2001. Patel voluntarily agreed to go to the police station and drove herself there in her own car at a time which she set. Once she arrived at the station, Cammiso told Patel that she was not under arrest and could leave at any time. The doors to the interview room were not locked. During the three hours, the officers did not physically restrain Patel in anyway. Moreover, at the end of the interrogation, the officer let Patel leave. The fact that Patel asked to speak to her father is not determinative to the custody determination. Patel is an adult and did not have a legal right to consult with her father. Consequently, although the questioning took place in the station house, Patel was the focus of the police investigation, and the police might have used false statements and/or deception during the interrogation, the totality of the circumstances indicate that Patel was not significantly "deprived of her freedom in any significant way" or that the government restrained Patel's "freedom of movement [to] the degree associated with formal arrest." Accordingly, this Court finds that Patel was not in custody, and thus, the officers were not required to give Patel Miranda warnings.

## II.    Voluntary Determination

Patel additionally contends that her confession was not "voluntary." Although neither Patel or the Government addressed this issue in any detail, the Court will briefly discuss whether Patel's alleged confession was voluntary.

Determining whether a defendant's pre-Miranda oral statements were voluntary is a separate and distinct inquiry from determining whether defendant was "in custody." See e.g., United States v. Hocking, 860 F.2d 769 (7th Cir. 1988) (court found no custodial interrogation and that the defendant's statement was voluntary).

In determining the voluntariness of a confession or statement, district courts examine the

"totality of the circumstances" to ensure that the confession "was not secured through psychological or physical intimidation but rather was the product of a rational intellect and free will." United States v. Montgomery, 14 F.3d 1189, 1194 (7th Cir. 1994). The crucial question is whether "the defendant's will was overborne at the time he confessed" or if the police obtained the statement through coercive means. Id.

Statements made during a "non-custodial interrogation are not viewed with suspicion." Fazio, 914 F.2d at 956. In examining coercion, courts examine the perspective of a reasonable person in the defendant's position at the time of the statement. United States v. Cichon, 48 F.3d at 276. Court should look to "the characteristics of the accused and the details of the interrogation" to determine whether a reasonable person would feel coerced. Montgomery, 14 F.3d at 1194. Specifically, courts should consider "the age of the defendant, her education, the nature of the questioning, the use of physical punishment, whether the defendant was read her rights, the duration of the questioning, the defendant's prior experience with police, and whether the defendant was under the influence of drugs or alcohol." Cichon, 48 F.3d at 276.

Here, as detailed above, examining the totality of the circumstance, this Court finds that Patel voluntarily agreed to go to the police station, was told that she was not under arrest and could leave at any time, and was not physically restrained or threatened. Moreover, this incident was not Patel's first interaction with the police. This Court thus finds that while the police might have used some deceptive interrogation techniques, Patel's free will was not overborne at the time she confessed and the police did not obtain her statement through coercive means. Accordingly, this Court finds that Patel voluntarily confessed to the police.

## CONCLUSION

For the reasons set forth above, the Court DENIES Defendant Patel's Motion to Suppress [66-1]. It is so ordered.

ENTER:

*Blanche M. Manning*
BLANCHE M. MANNING
U.S. DISTRICT COURT JUDGE

DATE: 11-18-02